## WM. H. REEVES, ET AL

### v.

### THE STATE OF ILLINOIS.

*Opinion filed April 20, 1905.*

1. WORDS AND PHRASES—*construction of term, "2% of cost," in computing architects' fees.* The term 2% of the cost of the buildings when used to designate the amount of an architect's commission for superintending the erection of buildings, signifies 2% of the contract price and not 2% of the actual cost price.

2. FEES AND SALARIES—*provision of Constitution as to payment of claims under agreements made without express authority of law.* Section 19, of Article IV, Constitution of 1870, provides that "The General Assembly shall never grant or authorize extra compensation, fee or allowance to any public officer, agent, servant or contractor, after service has been rendered or a contract made, *nor authorize the payment of any claim, or part thereof hereafter created against the State under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void.*"

3. CONSTITUTIONAL LAW—*money not to be diverted from appropriation by resolution.* Article IV, Section 17, of the Constitution provides that, no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution.

4. STATUTE OF LIMITATIONS—*act of 1847 in force.* The statute of limitations of 1847 was not repealed by implication, by the act of 1877 creating a commission of claims.

This is a claim for services rendered as architects by Wm. H. Reeves and J. M. Baillie, doing business under the firm name of Reeves & Baillie, under a contract entered into by said firm with the Commissioners of the

Asylum for the Incurable Insane at Bartonville—which contract reads as follows:

"This agreement made and entered into this 18th day of February, A. D. eighteen hundred and ninety-eight, by and between Reeves & Baillie, Architects, parties of the first part, hereinafter known as the architects, and the Commissioners of the Asylum for the Incurable Insane at Bartonville, Illinois, owners, parties of the second part, hereinafter known as owners.

*Witnesseth:* That the said architects for and in consideration of the payments to be made to them by the said owners as hereinafter provided, do hereby covenant and agree to furnish for all building improvements upon said Asylum site, full architectural services, including plans, details, specifications and architectural supervision of construction, including a local superintendent on grounds during the construction of building. The said superintendent shall be satisfactory to the Commissioners. The said work to be done in a skillful and workmanlike manner. Said owners, for and in consideration of said architects strictly performing the covenants and agreements above specified, by and at the time mentioned do hereby agree to pay to the said architects a sum as stated below: three (3) per cent when any plans, details and specifications are completed, and the balance to be paid at the rate of two (2) per cent on contractor's estimate during the construction of the buildings for superintendence.

When more than one (1) building is built from the same plan, three (3) per cent of the cost of the first building is to be paid for plans, and specifications and two (2) per cent of the cost of all the buildings to be paid for superintendence.

It is agreed that in case the work is abandoned before completion, the architects are to be reimbursed for their labor as follows:

For preliminary studies one (1) per cent of estimated cost of building improvements.

For preliminary studies, general drawings and specifications three (3) per cent of estimated cost of buildings.

For preliminary studies, general drawings, specifications and details . . . . . . . . . . . .

For partial superintendence . . . . . . . . . . . per cent of the value of so much of the building as is completed at the time of such abandonment, in addition to the amount to be paid for preliminary studies, general drawings, specifications and details as above specified.

Additional reimbursements, as agreed upon, to be made to the architect by the owner for the following additional service, to-wit:

For surveys of land and measurements incident thereto.

For alterations and additions in the contracts or plans caused by deviations from the original scheme after the working drawings have been completed.

For necessary traveling expenses and for time spent in visiting for professional consultation· . . . . . . . . . . . .

It is also agreed, that until a definite estimate is furnished, the architects' charges shall be based upon the proposed cost of the work, and the payments received by the architects from the owners during such time, shall be considered as installments of the entire fee, which is based upon the actual cost. The actual or total cost of the building when completed shall include all the fixtures necessary to render it fit for occupation, and the architects shall be entitled to extra compensation for furniture or other articles designed or purchased by them.

It is further agreed, that if any material or work used in the construction of the building be already upon the ground, or comes into the possession of the owners without expense to them, the value of said material or work is to be added to the sum actually expended upon the building before the architects' commission is completed.

It is further agreed that all drawings, specifications, etc., as instruments of service, are the property of the

architects and are to be returned to them after having answered the purpose for which they were made, or upon demand of the architects.

The work provided for in this contract shall be completed within three years from the date thereof.

Should any dispute arise respecting the provisions of this contract or any question arising thereunder or the value of the work done in case of abandonment, the same shall be submitted to three arbitrators, each of the disputing parties choosing one, and these two a third, and the decision of such arbitrators, shall be final and binding on all parties.   And in case of such dispute if, after written notice from one party to another of the appointment of an arbitrator, the party so notified fails to appoint a second arbitrator within ten (10) days from the receipt of such notice, the arbitrator appointed by the party giving such notice shall proceed alone and decide the matter in dispute and his decision shall be final and binding on all parties, the same as if the matter had been decided by three arbitrators appointed as above provided.

The entire expense of such arbitration shall be borne by the party declared to be in the wrong.

Architects—Parties of the First part:

|  |  |
|---|---|
| REEVES & BAILLIE, | [SEAL.] |

Owners—Parties of the Second part:

|  |  |
|---|---|
| F. W. MENKE, | [SEAL.] |
| M. P. REED, | [SEAL.] |
| J. W. WILSON, | [SEAL.] |

Agreement between Reeves & Baillie, Architects, of the first part, and

Commissioners of the Asylum for the Incurable Insane, Bartonville, Illinois, of the second part.

For architectural services on building improvements, located at asylum site, Bartonville, Illinois.

Peoria, February 18, 1898."

Accompanying the petition filed in this case is a statement of account, (marked "Exhibit B") verified by the affidavit of J. M. Baillie, which is identical with the copy

of said account contained in the brief and argument of claimants' attorneys, except that said latter statement credits the Commissioners with $805.70, not credited in the original statement, for payments made to the claimants since the filing of their petition: which latter statements of account is as follows:

### Item No. 1.

To superintending the general construction of four buildings, known as the Employes, Domestic and Supply building and Boiler house, two per cent of Gleason & Sons contract, $54,678.50 . . . . .     $3,093.57

Rec. on account . . . . . . . . . . . .     2,374.12

     Bal . . . . . . . . . . . . . . . . . . . . . .      $719.45

### Item No. 2.

To superintending the general construction of four buildings known as the Employes, Domestic Supply building and Boiler house, two per cent of the extra cost incurred in finishing Gleason & Sons forfeited contract . . . . . . . . . . . . . . . . . . $61,215.42 less deduction

     3,989.75

     57,225.67

       $1,144.51

### Item No. 3.

To superintend the plumbing of four buildings, known as Employes, Domestic and Supply building and Boiler house, two per cent of John O'Neill & Sons contract $12,644 . . . . . . . . . . . . . . .     $252.88

Received on account . . . . . . . . .     70.08

     Bal . . . . . . . . . . . . . . . . . . . . .      $182.80

### Item No. 4.

To plans and specifications of the following buildings at three per cent of the cost based on the lowest bid

submitted for the building (exclusive of heating and plumbing):

| | | |
|---|---|---|
| Cottage A (erected) . | $14,270 | $428.10 |
| Cottage B | 15,795 | 473.85 |
| Cottage C | 38,800 | 1,164.00 |
| Cottage D | 19,081 | 572.43 |
| Dining hall (erected) | 11,152 | 334.56 |
| Bath house | 10,317 | 300.51 |
| Hospital | 70,720 | 2,121.60 |
| Milk house | 4,308 | 129.24 |
| Horse and cow barn | 18,081 | 542.43 |
| Administration bldg | 40,000 | 1,200.00 |
| Physicians res | 12,000 | 360.00 |

$7,635.72

ITEM No. 5.

Made sketches for the following buildings for which a charge of one per cent of estimated cost is made:

| | | |
|---|---|---|
| Amusement hall .... | $12,000 | $120.00 |
| Chapel morgue ..... | 7,000 | 70.00 |
| Water tower ....... | 8,000 | 80.00 |

270.00

$7,905.72

Rec. payment ......      .    3,640.00

Bal ..............    $4,265.72

Amt. with $2,046.76 brought forward.. $6,312.48

ITEM No. 6.

DEDUCTIONS FOR SUMS RECEIVED SINCE FILING OF CLAIM.

For sketches for water tower ............. $ 80.00

For plans and specifications for Cottage "B"    473.80

For credit on horse and cow barn as per agreement ..........................    251.90

$ 805.70

Total amount of claim ............... $6,312.48

Total amount received or agreed to be deducted ........................... 805.70

Balance of claim ................. $5,506.78

In behalf of the State, the Attorney General denies its liability; first, because the contract on which claimants rely was, as to most of their claim, made by the Commissioners without any authority and is therefore void: and second, that most of the items making up the claims are barred by the statute of limitations as to unliquidated claims against the State, not having been filed within two years after the cause of action accrued, as required by the act of 1847. Laws of 1847.

For convenience of reference the items making up the foregoing statements have been numbered from one to six.

As to item No. 1 (balance $719.45) and item No. 3 (balance $182.80) being for services rendered in superintending the construction of buildings authorized by the Legislature for which an appropriation had been made by the act of June 14, 1897, the court is of the opinion that these charges constitute legal claims and are in accordance with the contract hereinbefore quoted, viz: two per cent of the contract price for superintendence of construction.

Nor is the statute of limitations, pleaded in behalf of the State, a bar to either of those items (Nos. 1 and 3), nor to item No. 2, as the services for which these charges were made (superintending the construction of buildings under the Gleason contract) were not completed until March 1, 1902; page 16 of Deposition, the claim being filed April 30, 1903. As to item No. 2, $1,144.51, we have doubt as to the legality of this charge; for the construction to be placed on the wording of the contract, so far as it is applicable to this item is not entirely clear. Under their contract claimants were entitled to two per cent for superintendence. Is this commission to be figured on the contract price or on the actual cost price, as has been done in the statement of account. In one clause of the contract (written into a printed form —Exhibit B attached to claimants petition) are these words, "Said owners (the commissioners)    *    *    * agree to pay said architects a sum as stated below—

three (3) per cent when any plans, details and specifications are completed, and the balance to be paid at the rate of two (2) per cent on *contractors estimates during the construction of the buildings for superintendence."*

Further on in said contract is a clause—in a printed form—which reads, "It is also agreed that until a definite estimate is furnished, the architects' charges shall be based upon the proposed cost of the work, and the payments received by the architects from the owners during such time, shall be considered as installments of the entire fee, which is based upon the actual cost." To admit of a reasonable construction the word "cost" as last above used, must be understood as the cost under the contract. The cost to the Commissioners under the contract, not the cost to the contractor, nor the cost to the Commissioners who, succeeding the contractors as in this case, were obliged to finish the contract themselves. That this was the understanding of the claimants is shown by the fact that all their charges (in the statement of their account) are based and figured on the "Bids"— i. e. the cost, the contract price. The contract for the buildings on which this charge for superintendence is based, was let to Gleason & Sons for $154,678.50—on this amount claimants figured their three per cent charge for plans and specifications; but in as much as Gleason & Sons failed to carry out their contract and by reason of such failure, the Commissioners were themselves obliged to complete said buildings, at an additional cost of $57,-225.67 beyond the Gleason contract price, the claimants charge their two per cent commission on this additional cost, for superintendence.

We do not believe the contract is reasonably susceptible of such a construction, nor do we believe that either party at the time the contract was made intended or expected that it should be so construed, if they thought of such a contingency at all, which is not likely.

Had the cost of material, labor, etc. depreciated instead of advancing in price, thereby enabling the Commissioners to complete the buildings for less than the

contract price, it is not likely that claimants would have been willing to figure the two per cent commission on the decreased cost of the building, nor should they, under reversed conditions, expect commissions on the increased cost. We more readily adopt this interpretation of the contract (limiting the commission to the contract price) as there was no consequent hardship or loss (rather the opposite) to the claimants, resulting from the completion of the buildings by the Commissioners, though at an increased cost. Under the terms of their contract claimants were obliged to have a superintendent on the grounds during the construction of the buildings "at an expense of $5 a day every day he was there" (page 17 Deposition of W. H. Reeves.) "We furnished a man on the grounds at our expense during the entire construction of the buildings up to the time the contract for the erection of the buildings was forfeited by the Commissioners." Page 5 of deposition. "How much, if any, of the time we kept a man on the ground after the forfeiture of the Gleason contract I do not know." Page 7 Deposition Wm. H. Reeves. From the above it would appear that the completion of the building by the Commissioners, though at an increased cost over the contract price, effected a saving to the claimants rather than a loss or hardship. Irrespective of this consideration which has no legal bearing, we think the legal effect of the contract and the intention of the parties was that the percentage for superintendence should be based on the contract price, as was the three per cent for plans and specifications. (Deposition of W. H. Reeves, p.    ) "We were paid in full"—for the plans and specifications—"at the rate of three per cent (on $154,768.50) as the contract called for."

In accordance with the above views we hold that this charge of $1,144.51 (item No. 2 of Statement of Account) should not be allowed.

As to item No. 4, for plans and specifications of eleven buildings, for which in the aggregate a claim of $7,635.72 is made, being three per cent on the total

amount ($254,524.00) of the "bids" for said buildings, and as to item No. 5 for sketches of three buildings, for which a claim of $270.00 is made, being one per cent on the total amount ($27,000) of the bids for said three buildings, the Attorney General denies any liability on the part of the State, for the reason that the contract under which the services of claimants were rendered, was made by the Commissioners without authority of law.

From the letter of J. Mack Tanner, secretary, attached to the claim and marked "Exhibit C," it appears that this whole claim was presented to the Board of Charities and was by them disapproved, with a recommendation that it be not paid excepting as to the items of $719.45 and $182.80 for superintendence under the Gleason contract—basing their disapproval on the contention that the Commissioners, in entering into the contract with Reeves & Baillie, exceeded their authority.

That part of the letter applicable to items No. 4 and No. 5 of the account is as follows:

"A further claim was made for architectural service in preparing plans, specifications, etc., for certain buildings known as Cottages A, B, C and D, horse and cow barn, milk house, bath house, dining hall, hospital building and physician's cottage. If the Board of Commissions entered into any contract or agreement with Messrs. Reeves & Baillie to prepare such plans, they exceeded their authority for the law states: 'That they shall not have power to bind the State by any contract beyond the amount of the appropriation, which may at the time have been made for the purposes expressed in the contract.'

"These plans were prepared in 1898. At the time no appropriation had been made for the construction of any of the buildings for which these plans were drawn. In 1899, however, appropriations were made for nine cottages, one hospital building, two dining rooms, one bath house, one horse and cow barn and one milk house. Also for a water tower, for which plans were not prepared.

The nine cottages were all constructed from one plan.

"It would appear therefore, that the authority of the trustees or Commissioners did not extend beyond having plans prepared for these buildings for which appropriations were made. Inasmuch as Reeves & Baillie were paid improperly, as we believe, $3,640 out of funds appropriated for other purposes, they have already drawn more than could in our judgment be legally drawn and should not therefore receive the balance above mentioned as being due them until the whole matter shall be legally determined."

While we coincide wtih the Board of Charities in their conclusion that the Commissioners of the Asylum had no authority for entering into the contract with Reeves & Baillie for the plans and specifications, our conclusion is based on other provisions of the law than that cited in Mr. Tanner's letter—Hurd's Statutes, chapter 23, section 20—for we are inclined to agree with the contention of claimants attorneys that the restriction contained in said act is applicable only to the trustees of the institutions named in the body of the act. Trustees of most of the State institutions created since the above enactment are, by express provision of the act creating them, restricted and made subject to the above law. Though this provision is omitted in the act of 1895 creating the asylum for the incurable insane at Bartonville, yet we think it can hardly be contended that the omission exempts the Commissioners from the provisions of the constitution applicable to this subject.

Section 19 of Article IV, Constitution of 1870, is as follows:

"The General Assembly shall never grant or authorize extra compensation, fee or allowance to any public officer, agent, servant or contractor, after service has been rendered or a contract made, *nor authorize the payment of any claim, or part thereof hereafter created against the State under any agreement or contract made without express authority of law; and all such un-*

*authorized agreements or contracts shall be null and void.*"

In this case there was no appropriation, no express authority for erecting any of the buildings for which these plans and specifications were drawn and for which these charges are made. The appropriation of 1897 was for a specific purpose, for the erection of certain buildings therein named—none of those for which this charge is made being of the number.

It is urged by claimants' attorneys that the authority for the action of the Commissioners in employing the claimants to make these plans and specifications is contained in the joint resolution adopted by the Senate January 5, 1898. Concurred in by the House of Representatives, February 2, 1898. But this effect could not have been accomplished even if that had been the intention of the General Assembly—for the appropriation of 1897, having been made for a specific purpose, it could not by resolution, joint or separate, be diverted from that purpose, as would be done in this case if the contract relied on by claimants had been carried out as to the payment of these items.

"No money shall be drawn from the Treasury except in pursuance of an appropriation made by law, and on the presentation of a warrant issued by the Auditor thereon; *and no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution.*"

Const. Art. 4, Sec. 17.

(See *Burritt* v. *Commissioners of State Contracts,* 120 Ill. Rep., 322, as to the interpretation of the above constitutional provision and its prohibition of appropriations by "Resolutions.") Nor does the resolution of the General Assembly disclose any intention to divert the appropriation of 1895 to any other purpose than that indicated in the act. It had been found advisable to remove to a different site a building already constructed, located inadvertently over an

abandoned coal mine—authority to the trustees to make such change of site and to the Governor to hasten the construction of said building (provided for by the act of 1895) was all that was attempted or intended by the resolution, which was as follows:

CONCERNING HOSPITAL FOR INSANE, BARTONVILLE.

WHEREAS, The fortieth General Assembly in regular session made an appropriation of $247,750, for the construction, completion and maintenance of a hospital for the insane at Bartonville, Peoria county, Illinois; and

WHEREAS, It has been ascertained that said building was being constructed upon an insufficient foundation and that it would be detrimental to the interests of the State to complete said building upon the site where it is now located; and

WHEREAS, The appropriation by the said General Assembly provides for the completion of said building upon its present site; and

WHEREAS, It is necessary for the comfort and care of a large number of insane persons now in the several almshouses of Illinois, that said building be completed at the earliest possible moment for the relief of such persons; and

WHEREAS, The Governor of Illinois has made a careful examination of said structure and all the facts and circumstances surrounding the same, and did, on the 4th day of January, 1898, send a special message to the General Assembly calling attention to the condition of said institution and the need of its immediate completion, and making a request in reference to the appropriation aforesaid; therefore, be it

*Resolved, by the Senate, the House of Representatives concurring*: That it is the sense of the General Assembly that said institution should at once be completed, and that said appropriation as made should be used for that purpose on such site as may be selected by the Board of Trustees of such institution upon the land at Bartonville now owned by the State of Illinois; be it further

*Resolved,* That we concur in the recommendation of the Governor in said special message and accede to his request therein; be it further

*Resolved,* That the Governor is hereby authorized and requested to immediately proceed to the reconstruction of said building and its completion at the earliest possible moment, and that he use the appropriation made by this General Assembly, at its regular session for said purpose.

Adopted by the Senate January 5, 1898.

Concurred in by the House February 2, 1898.

We are unable to find anywhere, either in the original act of 1895 creating the institution, nor in the appropriation act of 1897, nor in the above resolution any authority or appropriation by which the Commissioners could bind the State for plans and specifications of buildings to cost (according to the bids included in items No. 4 and No. 5 of the statement of account) the sum of $281,-524—for which there had been, at the date of the contract—February 18, 1898—no appropriation whatever. While we do not question the good faith of the claimants, yet with their intelligence and extended experience in transacting business with trustees and officers and agents of the State, we feel that they were at least negligent and careless in that they failed to inform themselves as to what authority the Commissioners had for making the contract under which this large amount of work was done in the preparation of plans, etc. The wisdom of the constitutional restriction prohibiting payment by the General Assembly of claims created against the State under any agreement or contract made without express authority of law and declaring "all such unauthorized agreements or contracts to be null and void"—is borne out by this case in which no offense more serious than ignorance of the law is suspected or intimated. Yet if this claim of seven thousand or more dollars could be allowed for services rendered under an unauthorized contract, by the same rule there would be nothing to prevent other Boards of Trustees from binding the State in

like manner and for unlimited amounts, without reference to legislative authority or appropriations. Apart from the above construction of the law under which we hold that the commissioners had no autohrity to make the contract except as to the so called Gleason buildings, (which were authorized by the appropriation act of 1897) and that the charges for services rendered thereunder must be disallowed—we hold that the defense of the statute of limitations pleaded by the Attorney General bars recovery on all the items of the account, excepting for services rendered in connection with the Gleason contract, superintendence of those buildings not being completed until March 1, 1902 (page 16 of deposition) but the plans and specifications and sketches included in items Nos. 4 and 5 were completed during the winter, spring and summer of 1899—see abstract of evidence pages 5, 6 and 7—and the claim not being filed until April 30, 1903, there was failure to comply with the law which provides that "hereafter all unliquidated claims against the State shall be proved up and filed as above (with the Auditor) within two years from the time such claim may have arisen; and any claim not presented and proved up as above and filed shall be forever barred from payment by the State." It is contended in the brief and argument filed by claimants' attorneys that the "last work done on the cottages 'A' and 'C' and dining hall was performed on April 18, 1902," referring apparently to work of superintendence. However this may be, it does not establish the right of recovery as to the items contained in this statement of account, which were for services in drawing plans, specifications and sketches completed not later than the summer of 1899, June 1, 1899. The employment of claimant for making plans, specifications and sketches was under the contract of February 18, 1898. Whether or not that contract was authorized, whether it was legal and binding or null and void, the work done under this contract, for which the charges in items No. 4 and No. 5 are made, was completed during the summer of 1899, at which time the cause of action ac-

crued and inasmuch as the claim was not filed until April 30, 1903, it is barred by the statute of 1847, requiring that unliquidated claims shall be filed within two years. It is contended by claimants' attorneys that as to cottages "A" and "C" and the dining room, claims for these charges is saved from the operation of the statute because "the last work done on them was performed on April 18, 1902" about one year before the claim was filed. If this is correct, that work, presumedly for superintendence of construction on said cottages, must have been done under a separate and subsequent order, understanding or agreement; not that under which the plans and specifications were drawn and upon which this suit is brought, probably after subsequent appropriations were made warranting such employment of the claimant by the Commissioners. It is apparent from the evidence of W. H. Reeves that the plans and specifications for all the buildings named in item No. 4 and No. 5 were ordered in October and November, 1898 (see page 7 of depositions) and were all completed by the 1st of June, 1899—(page 9 of depositions) four years before the filing of this claim—the subsequent employment of claimants (if that was the fact) to superintend the construction of those buildings would not take from the operation of the statute those claims for plans and specifications made in pursuance of a separate order or alleged contract with the Commissioners made in the fall of 1898.

The claimants' attorneys argue with great earnestness that this court being, as they claim, "a court, not of oppression but one in the nature of a court of equity, which looks to the substance rather than to form and seeks to do justice between the parties," etc. Granting that this may be true, it cannot be contended or conceded that the court can ignore statutes and laws or by its decisions in effect repeal statutes or repeal the constitution. If the statute of limitations (of 1847) relating to unliquidated claims is unreasonable or works injustice to

claimants, its repeal by legislative authority should be sought. This court cannot repeal, amend or ignore the act so long as it is in force. So far as the court is informed or has been able to discover, the binding effect of this statute has been recognized and uniformly applied to all claims coming within its provisions. In the claim of Fairbanks v. the State filed with the Auditor May 11, 1880, the defense of the statute of 1847 was pleaded by the Attorney General in behalf of the State. The question was fully and ably argued by attorneys on both sides and on full consideration it was held by the court that the contention of claimants' counsel, that the statute of limitations (1847) had, by implication, been repealed by the act of 1877 creating a Commission of Claims, was untenable. That the act of 1877 "provides a forum for hearing and disposing of claims against the State and as to the manner of presentation and pressing such claims; but there is nothing in the act itself that is in conflict with the statute of limitations of 1847 above quoted and for that reason could not repeal that statute by implication." It was further held that the fact that the Legislature had made appropriations for similar claims, does not have the effect of repealing the law,—a statute law cannot be repealed or annulled in any such manner— no authority has been cited by attorneys in this or any other case, so far as we are informed, which can be construed as repealing or attempting to repeal the statute of limitations of 1847. This court has uniformly held and as at present constituted, still holds that the statute is in full force and effect, and in accordance with this opinion we hold that all the items of claimants' statement of account, excepting those arising under the Gleason contract are barred by this statute of limitations. As to item No. 2 for $1,144.51, this charge (founded on the increased cost of construction over and above the contract price) is disallowed as not being warranted by a reasonable construction of the contract dated February 18, 1898, on which claimant relies for recovery.

As to all the charges and claims for services included

in item No. 4 (total, $7,635.72) and in item No. 5 (total, $270) the court reject all of said claims, holding that they are founded on a contract made without authority on the part of the Commissioners, for which no appropriation had been made at the date of said contract (February 18, 1898) and that said contract was, therefore, null and void.

Aside from, or in addition to the above finding the court holds further that all the charges for services included in said items No. 4 and No. 5 are barred by the statute of limitations of 1847.

In conclusion, summarizing the foregoing findings, item No. 1, balance $719.45 is allowed; item No. 3, balance $182.80 is allowed, making a total sum of $902.25 that could be properly credited to claimants. Inasmuch, however, as all the other items of account and all other claims herein made are hereby disallowed and rejected; and inasmuch as it appears from the statement of account filed with this claim, and from evidence presented by claimants that the sums of $3,640 and $805.70 (total, $4,445.70) have been paid on this account to the claimants in addition to $4,640.35 (three per cent on $154,678) and $2,374.12 credited in the statement of account, we find that after deducting the above credit of $902.25 to which claimants were entitled there has been paid to said claimants by the Asylum Commissioners, without authority of law, and from appropriations made for other purposes, the sum of $3,542.70, over and above just credits and claims to which claimants were legally entitled.

The claim is therefore rejected. There is no provision for a further finding by this court.